## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MEYERS DIVISION

| | |
|---|---|
| ACUFLOOR, LLC, | |
| *Plaintiff*, | |
| v. | Case No.: 2:21-cv-00802-SPC-KCD |
| EVENTILE, INC. and FORPAC, LLC, | |
| *Defendants*. | |

## ACUFLOOR'S OPENING CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................... 1

II.  TECHNOLOGY BACKGROUND AND ASSERTED PATENTS ............... 1

III. LEGAL STANDARD ............................................................. 2

IV.  DISPUTED TERMS ............................................................... 3

   A.  "notch" ('857 Patent, Claims 1, 10; '274 Patent, Claims 1, 5, 8) ............. 3

   B.  "[first/second] corner" ('857 Patent, Claims 1, 10) ................................... 6

   C.  "tile edge" ('857 Patent, Claims 1, 10; '274 Patent, Claim 1, 5) ............. 12

   D.  "the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base" ('274 Patent, Claim 1, 5, 8).............. 15

   E.  "I-shaped base" ('857 Patent, Claims 1, 10) ........................................... 17

   F.  "backstop member" ('857 Patent, Claim 1; '274 Patent, Claim 1; '947 Patent, Claims 9, 10; '271 Patent, Claims 1, 8) ............................................. 20

   G.  "(Preamble) A wedge device for a tile leveling device including a clip member, the wedge device comprising" ('947 Patent, Claims 9, 10; '271 Patent, Claim 1)................................................................................................ 23

   H.  "a line-of-sight opening extending along the longitudinal axis and intersecting the longitudinal length from one-third (1/3) of the longitudinal length measured from the attachment end to one-third (1/3) of the longitudinal length measured from the penetrating edge" ('947 Patent, Claim 10)................................................................................................ 25

   I.  "inclined plane" ('947 Patent, Claims 9, 10; '271 Patent Claims 1, 2, 5, 6) 26

   J.  The Design Patent Terms .................................................................... 28

V.   Conclusion ................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arctic Cat Inc. v. GEP Power Prod., Inc.,*
   919 F.3d 1320 (Fed. Cir. 2019).................................................................. 23

*Beachcombers v. WildeWood Creative Prod., Inc.,*
   31 F.3d 1154 (Fed. Cir. 1994).........................................................................5

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.,*
   262 F.3d 1258 (Fed. Cir. 2001)............................................................. 27, 29

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,*
   289 F.3d 801 (Fed. Cir. 2002)..................................................................... 23

*Contessa Food Prods., Inc. v. Conagra, Inc.,*
   282 F.3d 1370 (Fed. Cir. 2002)................................................................... 29

*Freescale Semiconductor, Inc. v. Promos Techs., Inc.,*
   561 F. Supp. 2d 732 (E.D. Tex. 2008) ....................................................... 20

*GE Lighting Solutions, LLC v. AgiLight, Inc.,*
   750 F.3d 1304 (Fed. Cir. 2014)......................................................................3

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.,*
   162 F.3d 1113 (Fed. Cir. 1998)................................................................... 30

*Hill-Rom Servs., Inc. v. Stryker Corp.,*
   755 F.3d 1367 (Fed. Cir. 2014)................................................................... 22

*JVW Enterprises, Inc. v. Interact Accessories, Inc.,*
   424 F.3d 1324 (Fed. Cir. 2005)................................................................... 19

*N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.,*
   215 F.3d 1281 (Fed. Cir. 2000)................................................................... 18

*Nobel Biocare Servs. AG v. Instradent USA, Inc.,*
   903 F.3d 1365 (Fed. Cir. 2018)............................................................. 9, 22

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................ 3, 27

*Richmond v. Forever Gifts, Inc.*,
No. 3:14-CV-0583-K, 2015 WL 3421370 (N.D. Tex. May 27, 2015) ........................................................................................ 11

*Spineology, Inc v. Wright Med. Tech., Inc.*,
739 Fed. Appx. 633 (Fed. Cir. 2018) .............................................. 27, 29, 30

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985) ........................................................ 5

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ....................................................... 23

*Tannas v. Multichip Display, Inc.*,
No. SACV15282AGJCGX, 2016 WL 6809564 (C.D. Cal. June 14, 2016) ........................................................................................ 11

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........................................................ 3

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........................................................ 3

## Other Authorities

*Corner Definition & Meaning*, MERRIAM WEBSTER,
https://www.merriam-webster.com/dictionary/corner (last visited June 6, 2022) ................................................................... 11

*Edge Definition & Meaning*, MERRIAM WEBSTER,
https://www.merriam-webster.com/dictionary/edge (last visited June 6, 2022) ................................................................... 14

## I.    INTRODUCTION

Eventile and Forpac have collectively proposed eleven terms for construction, two of which refer to design patent figures.  Most of the disputed terms are well-known to those in the art and do not require construction. Defendants' constructions seek to redraft the claims to include limitations that are inconsistent with the intrinsic evidence and unduly limit the scope of the invention.  Acufloor respectfully requests the Court reject Defendants' improper proposed constructions and adopt Acufloor's proposals.

## II.    TECHNOLOGY BACKGROUND AND ASSERTED PATENTS

The Asserted Patents[1] claim novel tile-leveling devices developed by Clinton and Joshua Bunch, a father-son team with a collective sixty-seven years of experience in the ceramic tile-installation business and co-founders of Acufloor.[2] The inventive tile-leveling devices comprise two parts: a tile clip and a wedge.[3]  During use, the installer places the tile clip between two or more tiles so that the tiles lie over the base of the clip, and the body of the clip extends upwards between the tiles.[4]  The installer then inserts the wedge through an open window in the body of the clip, putting pressure on the

---

[1] Acufloor asserts six patents: U.S. Patent Nos. 10,513,857 ("the '857 Patent"); 10,704,274 ("the '274 Patent"); 10,501,947 ("the '974 Patent"); 10,704,271 ("the '271 Patent"); D832,680 ("the D'680 Patent"); and ("the D'527 Patent") (collectively, "the Asserted Patents"). The Asserted Patents are attached as Exhibits 1-6 of the Complaint, Dkt Nos. 1-1 to 1-6.
[2] Dkt. 1 ¶¶ 5-11.
[3] Ex. A, Decl. of Jerry Lopez, dated Aug. 4, 2022 ("Lopez Decl.") ¶ 18; '857 Patent, 5:43-54.
[4] Ex. A, Lopez Decl. ¶ 18; '857 Patent, 4:26-41, 6:12-25.

upper surfaces of the tiles to level them.[5]  Figures 11A, 11B, and 12 of the

'857 Patent below illustrate the inventive clip and wedge device and how they

are used in installation:



The '857 and '274 Patents disclose a novel shape for the clip in which

"notches" in the base of the clip allow the mortar (or thinset) beneath the part

of the tile over the notches to directly contact the subfloor.[6]  This direct tile-

to-mortar-to-subfloor contact strengthens the adhesion between the tile and

the subfloor, which prevents the tile from breaking.[7]  The remaining Asserted

Patents are directed to wedge devices with line-of-sight openings that permit

users to view the tiles beneath the wedge during installation.[8]

## III.   LEGAL STANDARD

Claim terms "are generally given their ordinary and customary

---

[5] Ex. A, Lopez Decl. ¶ 20; '857 Patent, 5:1-11, 5:43-6:25.
[6] Ex. A, Lopez Decl. ¶ 22; '857 Patent, 5:58-62.
[7] Ex. A, Lopez Decl. ¶¶ 23-25.
[8] *Id.* at ¶ 26-27; '947 Patent, Abstract; D'680 Patent; D'527 Patent.

meaning" as understood by a skilled artisan at the time of the invention.[9]

"There are only two exceptions to this general rule: 1) when a patentee sets

out a definition and acts as his own lexicographer; or 2) when the patentee

disavows the full scope of a claim term either in the specification or during

prosecution."[10]  "The standards for finding lexicography and disavowal are

exacting."[11]  Absent disavowal, it is improper to limit claims based on figures

or descriptions of exemplary embodiments.[12]  Ultimately, the construction

"that stays true to the claim language and most naturally aligns with the

patent's description of the invention will be . . . the correct construction."[13]

## IV.   DISPUTED TERMS

### A. "notch" ('857 Patent, Claims 1, 10; '274 Patent, Claims 1, 5, 8)

| Acufloor's Construction | Eventile's Construction | Forpac's Construction |
|---|---|---|
| opening intersecting an edge of the base through which mortar can penetrate. | an opening intersecting an edge of the base that is sized and located to permit edge-to-mortar-to-subfloor contact. | An opening in the base that is sized and located to permit edge-to-subfloor contact. |

Acufloor's proposed construction clarifies two important aspects of the

"notch" described in the '847 and '274 Patents.  First, as all parties agree, the

notch must be an "opening" that allows mortar to penetrate the base of the

[9] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).
[10] *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).
[11] *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).
[12] *Id.* at 1323.
[13] *Phillips*, 415 F.3d at 1316.

clip and adhere to the underside of a tile placed over the base.[14]

Second, as Eventile agrees, the opening formed by the "notch" must extend all the way to the base's edge.  This is consistent with the figures of the patent, which uniformly depict "notches" as openings that extend to the borders of the base,[15]  as well as the patentee's statements during prosecution specifically distinguishing notches from other openings.[16]  Acufloor's construction is also consistent with the ordinary meaning of the term "notch" in the art, which is commonly used to describe the openings along the edge of a "notched trowel" — a device used to spread mortar in a ridged pattern:[17]



Defendants' proposed constructions improperly import the concept of "edge-to-subfloor" or "edge-to-mortar-to-subfloor" contact into the term "notch."  But the claims themselves make clear that the term notch alone

---

[14] '857 Patent, 3:31-34; 5:60-61, 6:12-18.
[15] *See, e.g.*, '857 Patent, Figs. 11A, 15, 16.
[16] *See, e.g.*, Ex. B, '274 Patent File History, Dec. 26, 2019 Applicant Arguments/Remarks Made in an Amendment at 22; *see also* Ex. N, U.S. Publication US 2008/0236094A1 to Doda (featuring a square shaped hole in its base as distinguished from the "notch" of the '857 and '274 Patents).
[17] Ex. A, Lopez Decl. ¶ 47.

4

does **not** require "edge-to-mortar-to-subfloor" contact.  Where the claims require that the notch provide edge-to-mortar-to-subfloor contact, they expressly say so.  For example, each of the claims of the '857 Patent and claims 1 and 5 of the '274 Patent separately recite that the notches provide edge-to-mortar-to-subfloor contact.[18]  If the term "notch" inherently included this feature, as Defendants propose, this claim language would be redundant.

Even more tellingly, Claims 5 and 8 of the '274 Patent are identical except that claim 5 additionally recites that the "notches" provide "tile edge-to-mortar-to-subfloor contact."  Construing "notch" to require that it provide "tile edge-to-mortar-to-subfloor contact" would render claim 8 superfluous.  Under the doctrine of claim differentiation, a construction that renders claims redundant is "presumptively unreasonable" and should be avoided.[19]

Nothing in the intrinsic record overcomes that presumption.  Nowhere does the specification narrowly define "notch" to require that it provide tile edge-to-mortar-to-subfloor contact (as opposed to tile-to-mortar-to-subfloor contact at other parts of the tile).  And while the patentee argued during prosecution that the "notches" of certain claims provide tile edge-to-subfloor

---

[18] *See, e.g.*, '274 Patent, claim 5 ("the first notch providing first tile edge-to-mortar-to-subfloor contact").

[19] *Beachcombers v. WildeWood Creative Prod., Inc.*, 31 F.3d 1154, 1162 (Fed. Cir. 1994); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("[W]hen a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim . . . .").

contact, each of those arguments addressed claims that separately recited edge-to-mortar-to-subfloor contact.[20]  In fact, during the prosecution of the parent of the '857 and '274 Patents, the examiner expressly found that the term "notch" does ***not*** require edge-to-mortar-to-subfloor contact.[21] The applicant then amended certain claims to recite that feature.[22]

Accordingly, the Court should construe the term "notch" as an "opening intersecting an edge of the base through which mortar can penetrate."

**B. "[first/second] corner" ('857 Patent, Claims 1, 10)**

| Acufloor's Construction | Eventile's Construction | Forpac's Construction |
|---|---|---|
| Plain and ordinary meaning | The point where two converging horizontal edges of the tile meet | The point at which two or more surfaces of the tile meet to form an angle. |

The '857 Patent uses the term "corner" in a manner consistent with its plain and ordinary meaning, to refer to the area or region where two sides of a tile meet. Defendants' proposal that the term "corner" instead be restricted to a single point is contrary to the purpose of the claimed inventions and the intrinsic record and should be rejected.

The claims of the '857 Patent recite that the notches in the base of the clip provide "corner-to-mortar-to-subfloor" contact.  As the specification

---

[20] *See, e.g.*, Ex. C, '857 Patent File History, Mar. 20, 2019 Amendment and Response at 13-16 (distinguishing prior art from claims reciting notches "with edge-to-subfloor contact at the [first/second] notch").
[21] Ex. O, U.S. App. No. 15/345,802 File History, Nov. 27, 2017 Arguments Made in Amendment at 13-14.
[22] *Id.* at 14.

6

explains, this "corner-to-mortar-to-subfloor contact" enables an installation configuration in which the corners of two or more tiles are placed over the notches, as shown in Figures 4 and 5 of the '857 Patent.[23]  Placing a single clip at the corners of multiple tiles reduces the number of clips needed.[24]

As the patentee explained during prosecution, the corner-to-subfloor-to-mortar contact provided by the notches in this configuration is critical because "corners and edges are the most vulnerable ***portion*** of any tile installation."[25]  "[I]f a tile breaks anywhere, it breaks there first."[26]  Thus, "[s]trong mortar contact at these locations is essential . . . ."[27]

The purpose of the claimed "corner-to-mortar-to-subfloor" contact makes clear that the patentee considered the "corner" to be a region or "portion" of the tile that must be supported and strongly bound to the floor.[28] It would be illogical to view the recited "corner" as a single point because support of a single point would provide little benefit.[29]  Instead, mortar must be applied across the ***area*** of the "corner" to prevent breakage.[30]  Further, a

---

[23] '857 Patent, Figs. 4, 5; 6:12-18; *see also* Lopez Decl. ¶¶ 24-25, 54-61.
[24] *Id.*, 4:14-19.
[25] Ex. D, '857 Patent File History, August 20, 2019 Applicant Arguments/Remarks Made in an Amendment at 25.  Throughout this brief, all emphasis is added unless otherwise noted.
[26] Ex. E, '247 Patent File History, February 27, 2020 Applicant Initiated Interview Summary at 3.
[27] Ex. D, '857 Patent File History, August 20, 2019 Applicant Arguments/Remarks Made in an Amendment at 25.
[28] Ex. A, Lopez Decl. ¶¶ 62-64.
[29] *Id.*
[30] *Id.*

tile installer would understand that tile breakage at the corner does not refer only to breaks or cracks at a single point at the extreme corner of the tile.[31]  A point has no area and therefore cannot crack or break.  Rather, a person of ordinary skill would understand corner breakage to include all breaks or cracks within the region of the corner, including those in the images below:[32]

 

The specification also makes clear that "corner" as used in the claims cannot be restricted to a single point.  For example, annotated Figure 11A of the '857 and '247 Patents below depicts an embodiment of the claimed tile clip that the specification expressly describes as providing "corner-to-subfloor contact due to the notches" in a four-tile installation configuration:

---

[31] *Id.* at ¶ 64.
[32] *Id.*



The tile clip includes "spacing pad[s] 152," which "may be utilized to position the tiles a predetermined distance apart" by laying the tiles to the front and back of the clip directly against the spacing pad (i.e., along the dashed blue line for the tiles to the front of the clip).[33]  As shown, the spacers 152 in this embodiment are narrower than central portion of the I-shaped base.  Thus, if the spacers were used properly, the points at the tips of the corners of the tile would rest over the base and **_not_** the notches.[34]  That the specification nevertheless describes the notches of this embodiment as providing "corner-to-subfloor contact" demonstrates that the corner cannot be restricted to the most extreme point of the tile, as Defendants contend.[35]

The patentee's explanation of the claimed "corner-to-mortar-to-subfloor" contact during the prosecution of the '274 Patent also confirms that

---

[33] '857 Patent at 5:65-67; Ex. A, Lopez Decl. ¶¶ 66-67; *see also Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment.").
[34] Ex. A, Lopez Decl. ¶¶ 66-67.
[35] '857 Patent at 6:15-18.

Defendants' construction cannot be correct.  In connection with an examiner interview, the patentee provided the following illustration of "corner to mortar to subfloor direct contact":[36]



As shown, in the patentee's illustration, the notch provides direct tile-to-mortar-to-subfloor contact in the area of the tile corner. But the tip of the corner lies over the base, such that the mortar beneath that point would ***not*** directly contact the subfloor.[37]  Thus, the patentee plainly did not consider the term "corner" to be restricted to a single point, as Defendants propose.[38]

Defendants attempt to overcome the intrinsic record's guidance with dictionary definitions of "corner." But the definitions they cite are equivocal, at best.  For example, Eventile cites the Merriam-Webster dictionary definition of "corner" and is likely to rely on definition 1a, which defines

---

[36]Ex. E, '247 Patent File History, Feb. 27, 2020 Applicant Initiated Interview Summary; Ex. F at ACUFLOOR-00002952 (color copy of the submitted presentation).
[37] *Id.*
[38] Ex. A, Lopez Decl. ¶¶ 69-70.

corner as "the point where converging lines, edges, or sides meet."[39]  But Merriam Webster also defines a "corner" as "the angular **part or space** between meeting lines, edges, or borders near the vertex of the angle,"[40] consistent with the '857 Patent's use of the term. Courts routinely reject similar efforts to support proposed constructions by cherry-picking supporting dictionary definitions while ignoring unhelpful ones.[41]

In addition to being unduly restrictive, Eventile and Forpac's constructions are ambiguous and internally inconsistent.  For example, Forpac defines "corner" as "the point at which two or more surfaces of the tile meet to form an angle." But the intersection of two surfaces forms a **line segment**, not a single point.  Defendants' proposed constructions are also contrary to the parties' agreed construction of "edge-to-subfloor contact of first corner-to-mortar-to-subfloor," which recites that "the bottom **surface** of the edge of the [first/second] corner of the tile is in direct contact" with the mortar, which is in direct contact with the subfloor below.[42]  A point does not have a "surface," so the agreed construction would be nonsensical if "corner"

---

[39] Ex. G, *Corner Definition & Meaning*, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/corner (last visited June 6, 2022).

[40] *Id.* (definition 2).

[41] *See Tannas v. Multichip Display, Inc.*, No. SACV15282AGJCGX, 2016 WL 6809564, at *5 (C.D. Cal. June 14, 2016)* ("Finally, Defendants cherry-pick a dictionary definition that they claim supports their proposed construction . . . while ignoring all of the other definitions that don't . . . The Court does not find this persuasive."); *see also Richmond v. Forever Gifts, Inc.*, No. 3:14-CV-0583-K, 2015 WL 3421370, at *6 (N.D. Tex. May 27, 2015).

[42] Dkt. 77-2 at 1.

were construed to mean a single point.

In sum, the Asserted Patents use the term "corner" in a plain and ordinary manner, which would be readily understood by a skilled artisan. Defendants' proposed constructions are contrary to the intrinsic record and do nothing to clarify the term and should therefore be rejected.

### C. "tile edge" ('857 Patent, Claims 1, 10; '274 Patent, Claim 1, 5)

| Acufloor's Construction | Eventile's Construction | Forpac's Construction |
|---|---|---|
| Plain and ordinary meaning | the line that is the intersection of two plane faces of a tile | The line at which a surface of a tile terminates. |

Defendants' attempt to restrict the term "edge" to a single line fails for the same reasons their constructions of "corner" fail.  As with "corner," the patents use the term "edge" to refer to a region or area, not a single line.

Claims 1 and 5 of the '274 Patent are similar to the claims of the '857 Patent, but they recite that the notches in the clip base provide "***edge***-to-mortar-to-subfloor contact." The purpose of this limitation is similar to the "corner-to-mortar-to-subfloor" contact limitation.[43]  As the patentee explained in prosecution, direct mortar-to-subfloor contact at the tile edge is "critical because corners and edges are the most vulnerable portion of any tile installation."[44] Requiring only that the line at the extreme edge of the tile be

---

[43] Ex. A, Lopez Decl. ¶¶ 75-76.
[44] Ex. D, '857 Patent File History, Aug. 20, 2019 Applicant Arguments/Remarks Made in an Amendment at 20.

supported in this way would not serve this purpose.[45] Likewise, a tile cannot break along a single line, since a line has no area.  Thus, a POSTIA would understand the Patentee's references to tile breakage at the edge to refer to any breaks in the edge region, including those in the pictures below:[46]

 

The patentee's own descriptions of edge-to-mortar-to-subfloor contact in the specification and in prosecution make clear that the "edge" is a region, not a line.  For example, the specification states that the notches of the clip in Figure 11A would provide edge-to-mortar-to-subfloor contact.[47]  But as shown above, if an installer laid tiles directly against the spacing pads of the clip of Figure 11A as intended, the lines at the extreme edges of the tiles would rest over the center portion of the base—not the notches.

Likewise, in the patentee's illustration of edge-to-mortar-to-subfloor

---

[45] Ex. A, Lopez Decl. ¶ 76.
[46] *Id.* ¶ 77.
[47] '857 Patent, 6:18-19.

contact during the prosecution of the '274 Patent, the lines at the extreme edges of the tile lies over the base, not the notches: [48]



Thus, the patentee clearly did not consider the edge to be restricted to just the line at the border of the tile.

Defendants once again attempt to overcome the intrinsic record's guidance with dictionary definitions.  But as with "corner," the dictionary definitions they cite do not support their position. For example, Eventile cites Merriam Webster's definitions of "edge," but one of those definitions is: "the narrow ***part*** adjacent to a border."[49]  At best, the submitted definitions illustrate that, like "corner," "edge" is a term that can have different meanings in different contexts.  The intrinsic record makes clear that in the '274 Patent, "edge" refers to the ***part*** of the tile around the borders.[50]

---

[48] Ex. E, '247 Patent File History, Feb. 27, 2020 Applicant Initiated Interview Summary (PTOL-413); Ex. F, Acufloor ACUFLOOR-00002952 – ACUFLOOR-00002958 (color copy of the submitted presentation).
[49] Ex. H, *Edge Definition & Meaning*, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/edge (last visited June 6, 2022) (definition 2A).
[50] Ex. A, Lopez Decl. ¶¶ 75-79.

The parties' agreed construction of "tile edge-to-mortar-to-subfloor contact" as "the bottom *surface* of the edge of a tile is in direct contact with the mortar beneath that edge of the tile . . . " further undermines Defendants' constructions because a line does not have a "surface."[51]

### D. "the combination of the first notch and the second notch providing a majority of an area of tile-to-mortar-to-subfloor contact for the tile leveling device within the bounds of the base" ('274 Patent, Claim 1, 5, 8)

| Acufloor's Construction | Eventile's Construction | Forpac's Construction |
|---|---|---|
| the combination of the first notch and the second notch providing the majority of the tile-to-mortar-to-subfloor contact that exists within the bounds of the base | the space created by the combination of the first notch and the second notch for providing the tile-to-mortar-to-subfloor contact comprising the majority of the area within the bounds of the base | The notches in the base collectively span an area that is larger than the solid portions of the base. |

Acufloor's proposed construction of this term clarifies that—consistent with the plain meaning of the claim language—the notches, as opposed to other openings, provide the majority of the "tile-to-mortar-to-subfloor" contact within the area of base. Acufloor's proposal comports with the most natural reading of the claims.[52] The claims state that the notches provide "a majority of an area of tile-to-mortar-to-subfloor contact."[53] They then specify that this majority is to be evaluated "within the bounds of the base."[54]

---

[51] Dkt. 77-2 at 1.
[52] Ex. A, Lopez Decl. ¶ 83.
[53] '274 Patent, Claims 1, 5, 8.
[54] *Id.*

Defendants attempt to twist the claim language to mean that the notches make up "a majority of [the] area . . . within the bounds of the base." But this reading ignores the phrase "of tile-to-mortar-to-subfloor contact for the tile leveling device," which modifies the claimed "majority." If the patentee had meant to claim that the "first and second notches provide a majority of an area within the bounds of the base," there would have been no reason to mention tile-to-mortar-to-subfloor contact at all.[55]

Acufloor's construction is further supported by the '274 Patent's prosecution history. The patentee added the disputed claim language to get around an obviousness rejection over the combination of International Patent Application No. 2013/03376 to Psaila ("Psaila") with another reference.[56] The Examiner contended that Psaila disclosed a base having the claimed notches.[57] Figures 1 and 2 of the Psaila are shown below:[58]

---

[55] Ex. A, Lopez Decl. ¶ 84.
[56] Ex. I, '274 File History, Oct. 25, 2019 Final Rejection at 2; Ex. J, '274 File History, Mar. 25, 2020 Request for Continued Examination at 10; Ex. K, '274 File History, April 3, 2020 Notice of Allowance and Fees Due.
[57] *Id.* at 3.
[58] Ex. L, International Patent Application No. 2013/03376 to Psaila at Figs. 1, 2.



As shown, the base of the Psaila device included small notches, but it also included several holes, the collective area of which would provide the majority of the tile-to-mortar-to-subfloor contact within the bounds of the base.  The disputed claim language distinguishes Psaila because in the claimed invention, the notches, not other openings, provide most of the tile-to-mortar-to-subfloor contact within the bounds of the base.[59]  A person of skill in the art would understand that this feature is desirable because notches provide stronger mortar contact and adhesion than other openings that are unconnected to the surrounding mortar.[60]

### E. "I-shaped base" ('857 Patent, Claims 1, 10)

| Acufloor's Construction | Eventile's Construction | Forpac's Construction |
|---|---|---|
| Plain and ordinary meaning | a base comprising a thin, elongated central member having four bars extending from the endpoints of the central member, wherein the bar | The base includes a thin, elongated central member and shorter bars extending from the extreme ends of the central member. |

---

[59] Ex. A, Lopez Decl. ¶ 86.
[60] *Id.*

17

| | length is substantially longer than the bar width | |
|---|---|---|

The meaning of the term "I-shaped" is described by the claim language itself and would be readily apparent to a person of skill in the art.  While the precise dimensions of a capital letter "I" can vary widely depending on the font or handwriting in which it is written, a printed capital I typically includes a central vertical line and two horizontal lines of approximately equal length that intersect it at its top and bottom.  Claims 1 and 5 of the '857 Patent make clear that the "I-shaped base" has this same general shape by reciting "spaced first, second, third, and fourth bars extending transversely from the body" to the front and the back of the tile clip.[61] Annotated Figures 11A and 16 below depict the I-shaped base as generally having these features:



Defendant's proposed constructions are wrong because they seek to

---

[61] Ex. A, Lopez Decl. ¶¶ 88-89.

place precise dimensions on the recited I-shape.[62]  Specifically, both Eventile

and Forpac seek to require that the base have a "thin, elongated central

member." Forpac's construction further recites that the bars are shorter than

the central member, while Eventile's construction recites that the bars are

"substantially longer" than they are wide.

But nothing in the intrinsic record mandates a specific length or shape

of either the bars or the central portion of the base.  Instead, the specification

generally describes "I-shaped base 122" as being "orthogonally coupled to the

inverted U-shaped body 114 such that four spaced bars 124, 126, 128, 130

extend transversely from the inverted U-shaped body 114" to the front and

rear.[63]  And while several figures depict embodiments in which the bars

appear shorter than the central member, the Federal Circuit prohibits to

importing limitations from the embodiments into claims.[64]

The prosecution history confirms that the term "I-shaped" describes the

general orientation of the bars relative to the clip as opposed to limiting the

length or shape of the claimed bars.[65]  During the prosecution of the first-filed

patent in the '857 Patent's family, the Patentee specifically distinguished the

---

[62] *N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000) (The
Federal Circuit "has repeatedly and clearly held that it will not read unstated limitations
into claim language.").
[63] '857 Patent at 5:48-54; 6:65-7:4.
[64] *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005).
[65] *See* Ex. A, Lopez Decl. ¶ 90.

"I-shaped base" of the invention from prior-art systems with an "H-shaped base."[66]  The patentee explained that the "bars of the I-shaped base stretch at a right angle to the U-shaped body."[67] The patentee contrasted this "I-shape" with a prior art reference having an "H-shaped" base with bars extending to the *sides* of (or parallel with) the clip body.[68]

Further, the terms Defendants seek to inject into the claims, such as "thin," "elongated," and "substantially," are all terms of degree that would inject unnecessary ambiguity into the claims.[69] Courts regularly reject proposed constructions that include subjective terms of degree that are not supported by the intrinsic record for this reason.[70]

### F. "backstop member" ('857 Patent, Claim 1; '274 Patent, Claim 1; '947 Patent, Claims 9, 10; '271 Patent, Claims 1, 8)

| Acufloor's Construction | Eventile's Construction | Forpac's Construction |
|---|---|---|
| Plain and ordinary meaning | a structure distinct from the wedge member that extends laterally outward from the rear of the wedge member to provide additional surface area for pushing the wedge device | A structure that is distinct from the wedge member and extends laterally outward from the rear of the wedge member to provide additional surface area for pushing the wedge device. |

The term "backstop member" is straightforward, and the Asserted

---

[66] Ex. M, U.S. App. No. 13/859,316 File History, Dec. 22, 2014 Amendment/Response at 14-15, Exs. A, B.

[67] *Id.*

[68] *Id.*

[69] Lopez Decl. ¶¶ 92-95.

[70] *See, e.g., Freescale Semiconductor, Inc. v. Promos Techs., Inc.*, 561 F. Supp. 2d 732, 740 (E.D. Tex. 2008).

Patents use it in its plain and ordinary meaning.  The '857 and '274 Patents describe the "backstop member" as "a contact surface" for driving the wedge through the clip.[71]  Similarly, the '947 and '271 Patents describe the "backstop member" as a surface that "provides a push area for fingers or a thumb."[72]  These descriptions comport with the plain meaning of "backstop."[73]

Nowhere do the Asserted Patents require that the backstop member "extend[] laterally outward" from the rear of the wedge, as Defendants propose.[74]  In fact, the intrinsic record directly contradicts Defendants' proposal.  For example, Figure 15 of the '947 and '271 Patents depicts "backstop member 176" as a wall that does ***not*** extend either laterally or vertically from the rear of the wedge member.[75]  Likewise, in Figure 1B of the '857 and '274 Patents, "backstop member 50" does not extend laterally outward from the outside walls of wedge members 52 and 54.[76]  These figures are shown below:

| '947 Patent, '271 Patent | '857 Patent, '274 Patent |
| --- | --- |

---

[71] '857 Patent, 4:39-58.
[72] "947 Patent, 3:28-32.
[73] Ex. A, Lopez Decl. ¶¶ 99-100.
[74] *See* Ex. A, Lopez Decl. ¶¶ 100-105.
[75] '947 Patent, Figs. 15, 5:37-41; *see also* '947 Patent Figure 16.
[76] '857 Patent, Fig. 1B, 3:48-50.

21



Fig.15

Fig.1B

The '947 Patent also describes an embodiment where the "backstop member . . . *is substantially flush with the attachment end*. . . ."[77]  "[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment."[78]  Defendants' constructions would exclude these embodiments and should therefore be rejected.

Dependent claims 8 of both the '947 and '271 Patents also refute Defendants' position by reciting "[t]he wedge device as recited in claim 1, wherein backstop member has a larger surface area than the attachment end."  These claims make clear that the claimed backstop member need not be oversized with respect to the wedge member in any direction.  Otherwise, they would be superfluous.[79]

Defendants also seek to require that the backstop member be "a structure that is distinct from the wedge member."  But the Asserted Patents

---

[77] '947 Patent, 5:14-17; *see also* Ex. A, Lopez Decl. ¶ 103.
[78] *Nobel Biocare Servs.*, 903 F.3d at 1381 (citation omitted).
[79] *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014) ("[A] dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."); *see also* Lopez Decl. ¶ 104.

contain no such requirement.  In every disclosed embodiment, the wedge device and the backstop member form a single, integral device.  Indeed, it is unclear what it means for the backstop member to be a "distinct structure" from the wedge member, since the Asserted Patents do not use that term.[80]

Accordingly, the term "backstop member" should be given its plain meaning, and Defendants' attempts to impose limitations that are contradicted by the intrinsic record should be rejected.

### G. "(Preamble) A wedge device for a tile leveling device including a clip member, the wedge device comprising" ('947 Patent, Claims 9, 10; '271 Patent, Claim 1)

| Acufloor's Construction | Eventile's Construction |
|---|---|
| Not limiting | Limiting, requires a wedge device including a clip member |

"Generally, a preamble is not limiting."[81] Exceptions exist where the preamble "recites *essential* structure or steps, or if it is *necessary* to give life, meaning, and vitality to the claim."[82]  But "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention," the preamble does not limit the claims.[83]

---

[80] Ex. A, Lopez Decl. ¶¶ 106-107.
[81] *Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1292 (Fed. Cir. 2015).*
[82] *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002) (emphasis in original).*
[83] *Arctic Cat Inc. v. GEP Power Prod., Inc., 919 F.3d 1320, 1328 (Fed. Cir. 2019).*

That is so here.  The claims' bodies define a structurally complete wedge device having a backstop member, a body, and a line-of-sight opening within the body. The preamble states an intended use for the claimed wedge device: it is "*for*" use with "a tile-leveling device that includes a clip member." But removing any reference to a clip member from the preamble would not affect the structural definition of the claimed wedge in any way.[84]

The specification of the '947 and '271 Patents also makes clear that the focus of the patents' invention is the wedge device and not the clip set it is intended to be used with.  Nearly all of the disclosure relates to the wedge device.  And although the specification does contain some discussion of a "clip member 12," it expressly states that "although a particular clip member is described and illustrated, the wedge device 10 presented herein may work with a variety of clip members . . . ."[85]

Eventile's position that the preambles require the claimed wedge device to "include a clip member" is illogical and contrary to the claims' plain language, which provides that the recited "tile leveling device"—not the wedge device—is what "includes the clip member." The specification explains that "the wedge device 10 and the clip member 12 are utilized, in combination, as part of a tile leveling device 14."[86]  Accordingly, Eventile's

---

[84] Ex. A, Lopez Decl. ¶¶ 111-115.
[85] '947 Patent, 3:16-21.
[86] '271 Patent, 2:67-3:4; '947 Patent, 2:60-64.

attempt to limit the claims based on the intended use stated in the preamble should be rejected.

**H. "a line-of-sight opening extending along the longitudinal axis and intersecting the longitudinal length from one-third (1/3) of the longitudinal length measured from the attachment end to one-third (1/3) of the longitudinal length measured from the penetrating edge" ('947 Patent, Claim 10)**

| Acufloor's Construction | Eventile's Construction |
|---|---|
| Plain and ordinary meaning | a line of sight opening that extends one-third (1/3) the distance of the longitudinal length of the wedge device measured starting from a point that is 1/3 the distance from the attachment end to a point that is the one-third (1/3) of the distance from the penetrating edge |

The disputed claim language is straightforward and requires no construction.  Eventile's proposed construction is a clear misreading of the claim and should be rejected.

The claim recites that the device includes "a line-of-sight opening" that "extends along the longitudinal axis" of the device and is long enough to "*intersect* the longitudinal length" of the device at the one-third mark measured from either end.[87]  Eventile attempts to rewrite the claim to require that the opening extend ***exactly*** one-third of the distance of the longitudinal length—from exactly one-third of the length measured from the attachment end to exactly one-third of the length measured from the

---

[87] '947 Patent, Claim 10.

penetrating edge.

Eventile's construction reads the word "intersect" out of the claim.  It also excludes the specification's sole example of a wedge device with line-of-sight opening that "intersects the longitudinal length from one-third (⅓) of the longitudinal length measured from the attachment end to one-third (⅓) of the longitudinal length measured from the penetrating edge," which appears in Figure 12.[88]  As shown below, the opening of the wedge device of Figure 12 *intersects* but *extends past* the 1/3 length marks 104.



Eventile's construction is thus contrary to the plain language of the claim and the specification and should be rejected.

### I.  "inclined plane" ('947 Patent, Claims 9, 10; '271 Patent Claims 1, 2, 5, 6)

| Acufloor's Construction | Eventile's Construction |
| --- | --- |
| sloped surface | sloped flat surface |

Acufloor and Eventile agree that the inclined plane includes a sloped

---

[88] '947 Patent, 4:54-57.

surface, consistent with the term's plain meaning and the specification.[89]  But Eventile asserts that the "inclined plane" must also be "flat."

This additional limitation contradicts the patents' repeated disclosures that the inclined plane may include "teeth" along its surface.  For example, the specification provides that "[t]eeth 32 are positioned along the inclined plane 28 in order to latch onto the clip member 12."[90]  And each of the figures depicts the "inclined plane 28" as having a jagged surface with teeth:



*Fig.6*

Eventile's proposed construction also contradicts claim 2 of both the '947 and '271 Patents, which each recite "teeth disposed along the inclined plane."[91]

Eventile relies heavily on the purported plain meaning of the term "plane."  But the Federal Circuit has repeatedly cautioned that courts should not elevate dictionary definitions over the intrinsic evidence, as Eventile urges.[92]  The Asserted Patents' repeated and consistent characterizations of the claimed "inclined plane" demonstrate that the term cannot be limited to

---

[89] *See, e.g.*, '947 Patent, 1:48-50, 3:1-7, 4:26-29, Figs. 1B, 6, 9, 11, 13-16.
[90] '947 Patent, 3:4-6.
[91] *See Spineology, Inc v. Wright Med. Tech., Inc.*, 739 Fed. Appx. 633, 637-38 (Fed. Cir. 2018) (holding that it is inappropriate to adopt constructions that conflict with dependent claims.)
[92] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320-25 (Fed. Cir. 2005).

"flat" surfaces, and Eventile's construction should therefore be rejected.[93]

## J. The Design Patent Terms

| Design Patent Term | Acufloor's Construction | Eventile's Construction |
|---|---|---|
| '680 design drawings | The figures speak for themselves | An ornamental design for a wedge device having a smooth sloped planar portion without ridges at the insertion end of the wedge device, a sloped smooth planar portion at the top of the end of the wedge device opposite the insertion end of the wedge device, a vertical line-of- sight hole along the longitudinal axis of the wedge device having four curved corners extending less than half the longitudinal length of the wedge device, and a 90 degree vertical ridge at each of the two 90 degree corners at the end of the wedge device opposite the insertion end |
| '527 design drawings | The figures speak for themselves | An ornamental design for a wedge device having a smooth sloped planar portion without ridges at the insertion end of the wedge device, a horizontal smooth planar portion without ridges at the top of the end of the wedge device opposite the insertion end, a vertical line-of sight hole along the longitudinal axis of the wedge device having four curved corners, and a 90 degree vertical ridge at each of the two 90 degree corners at the end of the wedge device opposite the insertion end |

The Federal Circuit has held that "a design is better represented by an illustration than it could be by any description."[94]  Accordingly, "the

---

[93] *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) ([W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning," that meaning should apply.)
[94] Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008).

preferable course ordinarily [is] for a district court **not** to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design."[95]   Yet Eventile asks the Court to do precisely that by proposing long, element-by-element descriptions of each design patent.

Courts have frequently emphasized that the scope of a design patent should be defined by a design's visual "appearance as a whole" and not by specific elements.[96]   As the Federal Circuit has cautioned, Eventile's suggested approach risks "placing undue emphasis on particular features of the design," which can cause "a finder of fact [to] focus on each individual described feature in the verbal description rather than on the design as a whole."[97]   Far from avoiding these risks, Eventile's proposals embrace them by reciting a long list of purported requirements of the claimed design that are each focused on individual features.

Although the Federal Circuit has noted that there may be circumstances in which it may be useful for a court to provide limited verbal guidance on the scope of a design patent,[98] none of those circumstances exist here.   For example, "a trial court can usefully guide the finder of fact by . . . distinguishing between those features of the claimed design that are

---

[95] *Id.*
[96] *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1377 (Fed. Cir. 2002).
[97] *Id.* at 679-80.
[98] *Egyptian Goddess*, 543 F.3d at 679-680.

ornamental and those that are purely functional."[99]  But Eventile's

constructions do nothing to guide the jury on functional versus ornamental

features.[100]  Further, the file histories for both patents are brief and did not

include any prior-art rejections. Thus, there is no need to "assess[] and

describe[] the effect of any representations that may have been made in the

course of the prosecution history."[101]

Accordingly, the Court should reject Eventile's constructions and

instead adopt the "preferable course" proposed by Acufloor of relying on the

claimed designs as shown in the drawings.[102]  Unlike Eventile's lengthy

verbal descriptions, Acufloor's proposed constructions minimize the risk that

the fact finder will "plac[e] undue emphasis on particular features" and,

instead, encourage the fact finder to focus on each of "the design[s] as a

whole."[103]

## V.   Conclusion

For the foregoing reasons, Conformis requests an order consistent with

Acufloor's proposed constructions.

---

[99] *Id.* at 680.
[100] Joint Claim Construction Statement, Ex. D, Dkt. 77-4 at 10-11.
[101] *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998).
[102] *Egyptian Goddess*, 543 F.3d at 679.
[103] *Id.*

Dated: August 4, 2022          Respectfully submitted,

*/s/ John R. Emerson*
JOHN R. EMERSON (*Pro Hac Vice*)
russ.emerson@haynesboone.com
*Lead Counsel*
TIFFANY M. COOKE (*Pro Hac Vice*)
tiffany.cooke@haynesboone.com
CAROLINE W. FOX (*Pro Hac Vice*)
caroline.fox@haynesboone.com
ANDREW DROTT (*Pro Hac Vice*)
andrew.drott@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
(214) 651-5000

NICOLETTE NUNEZ (*Pro Hac Vice*)
nicolette.nunez@haynesboone.com
HAYNES AND BOONE, LLP
600 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
(949) 202-3000

and

JOHN N. MURATIDES, ESQUIRE
Florida Bar No. 332615
jmuratides@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
401 E. Jackson Street, Suite 2100 (33602)
Post Office Box 3299
Tampa, Florida 33601
Telephone: (813) 223-4800

**ATTORNEYS FOR PLAINTIFF**
**ACUFLOOR, LLC**

31

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 4, 2022, I filed the foregoing with the Clerk of the Court via CM/ECF which will serve a true and correct copy upon all counsel of record.

*/s/John R. Emerson*

John R. Emerson
